UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 3:17-cr-253-J-20JBT

SAUVIAR ADDORINN WRIGHT
_____/

### REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Evidence From Hotel Room ("Motion") (Doc. 32) and the Government's Response thereto (Doc. 38).  The undersigned held an evidentiary hearing on June 27, 2018. (*See* Transcript ("Tr.") at Doc. 41.)  For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

### I.    General Background[2]

On October 5, 2017, Sergeant Daniel Pfannenstein, Detective M. Sowell, Officer Brian Housend, and Officer B.G. Johnson, all of the Jacksonville Sheriff's Office (collectively "Officers"), conducted a "knock and talk" at Room 115 of the Eagle Inn (the "Room") to follow up on a tip that drugs were being sold out of the

---

[1] "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], . . . a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim. P. 59(b)(2).  "Failure to object in accordance with this rule waives a party's right to review."  *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

[2] This information is provided for context only and, although consistent with the undersigned's findings of fact, it does not strictly constitute findings of fact.  The evidence relevant to the specific issues raised by Defendant is discussed below.

Room.  The Officers knocked on the door and Defendant's fiancé, Donyale Bowens, answered.  After a brief interaction with Ms. Bowens, the Officers entered and eventually searched the Room.  A firearm, which forms the basis of the one-count indictment charging Defendant with possession of a firearm by a convicted felon, was found in a sock under a dresser that the Officers moved away from the wall. Drugs were found on top of a nightstand, in a drawer inside the nightstand, and under the dresser.  In addition, while searching the Room, the Officers noticed that the bathroom window was open and a recently used cell phone was laying outside on the ground near the window.  The Officers then searched a gated area behind the Room and found Defendant, who had previously fled from the Room when the Officers knocked on the door.  Defendant, who had an outstanding warrant for a parole violation, was arrested for giving the Officers a false name, and for possession of the illegal items found in the Room.  He later made incriminating statements.

## II.    The Motion

Defendant seeks to suppress all items, including the subject firearm and drugs seized from the Room, as well as any statements he made to law enforcement after his arrest.  (Doc. 32.)  Defendant argues that the warrantless search of the Room was illegal because Ms. Bowens did not voluntarily consent to the Officers' entry into

or search of the Room.[3]  (*Id.*)

### III.  Legal Principles

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983). "The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment."  *Id.*  "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

"[C]onsent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search . . . ."  *Fernandez v. California*, 571 U.S. 292, 300 (2014).  Regarding voluntariness, the Eleventh Circuit has stated:

> A consensual search is constitutional if it is voluntary; if it is the product of an essentially free and unconstrained choice.  In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances.  A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error.
>
> In evaluating the totality of the circumstances underlying

---

[3] The Government does not challenge Defendant's standing to raise this argument. Thus, for purposes of this Report and Recommendation, the undersigned assumes that Defendant has such standing.

> consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.

*United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (citations and quotations omitted). "[W]hether the defendant was free to leave" is also a relevant factor. *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002). The factors set forth in *Purcell* also apply to consent obtained from a third party. *See United States v. Sanders*, 315 F. App'x 819, 822–24 (11th Cir. 2009) (analyzing the voluntariness of a third party's consent to a search using the factors set forth in *Purcell*).[4]

## IV.   Analysis

Defendant argues that Ms. Bowens did not voluntarily consent to either the entry into or the search of the Room by the Officers. (Doc. 32, Tr. 119–26.) For the reasons set forth below, the undersigned recommends that, based on the totality of circumstances, the Government proved by a preponderance of the evidence that the search was constitutional because Ms. Bowens voluntarily consented to both the entry into and search of the Room. Therefore, the undersigned recommends that

---

[4] Although unpublished Eleventh Circuit opinions are not binding precedent, they may be persuasive authority on a particular point. Rule 32.1 of the Federal Rules of Appellate Procedure expressly permits a court to cite to unpublished opinions that have been issued on or after January 1, 2007. Fed. R. App. P. 32.1(a).

the Motion be denied.[5]

### A.   Summary of Testimony of the Government's Witnesses[6]

At the hearing, the Government called the four Officers, who testified generally, and largely consistently, as follows.[7]   On October 5, 2017, shortly after 11:00 a.m., the Officers conducted a "knock and talk" at the Room.   (Tr. 7, 12, 27–28, 53, 63, 65–66, 81.)   The Officers knocked on the door of the Room and waited approximately one minute before Ms. Bowens opened the door.   (Tr. 7, 28, 40, 53, 68, 81.)   When Ms. Bowens opened the door, the Officers, who were in uniform, identified themselves and informed Ms. Bowens that they were conducting a drug investigation involving the Room.   (Tr. 7, 28, 40, 72.)   Ms. Bowens quickly invited the Officers into the Room by waiving them in and/or telling them to come inside.   (Tr. 7, 17, 19, 28, 40–42, 53, 69, 70, 72, 81, 92.)   Detective Sowell testified

---

[5] Regarding the incriminating statements Defendant made to law enforcement, Defendant argues only that he would not have been found and arrested had the Officers not unlawfully entered and searched the Room.   (*See* Doc. 32, Tr. 126.)   Therefore, the undersigned need not separately address the circumstances surrounding the making of those statements.   However, Officer Housend testified that he read Defendant his *Miranda* rights before Defendant made the subject statements.   (Tr. 57–58.)

[6] The undersigned has considered all of the evidence presented at the hearing, even if not referred to herein, which consists of the testimony of all of the witnesses, Defendant's photographs of the Room (Defendant's Exhibits 1, 2, and 3), and Defendant's DVD depicting law enforcement's interview with Ms. Bowens after she was arrested following the search of the Room (Defendant's Exhibit 4).   The Government offered no exhibits.   The undersigned specifically addresses only the evidence most relevant to whether Ms. Bowens voluntarily consented to the entry into and search of the Room.

[7] To the extent there was any inconsistency among the Officers' testimony, the undersigned finds it relatively minor and understandable.   Thus, unless otherwise noted, the undersigned refers to their testimony collectively herein.

that Ms. Bowens wanted to talk inside rather than outside.  (Tr. 28, 40–41.) Sergeant Pfannenstein testified that no Officer crossed the threshold into the Room before being waved in.  (Tr. 18–19.)

Once inside the room, the Officers smelled marijuana and observed marijuana and a marijuana pipe in plain view.[8]  (Tr. 8, 19, 28–29, 53, 70–72, 82.)  The Officers asked Ms. Bowens if they could search the room, and she gave verbal consent to a search of the Room.  (Tr. 8, 20, 29, 43–44, 47–48, 54, 73, 81–82, 92.)  Ms. Bowens was on or near the bed inside the Room at the time she consented to the search, and she was not under arrest or in handcuffs.  (Tr. 29, 33, 43, 54, 72–73, 82–83, 92–94.)  However, based on the illegal items in plain view, she was not free to leave.  (Tr. 19.)

The consent given by Ms. Bowens was not limited; she gave consent to search the entire Room and never objected while the Officers were searching the Room.  (Tr. 24, 50.)  In addition to the marijuana in plain view on the nightstand, the Officers found a box containing drugs, including fentanyl and crack cocaine, in a drawer inside the nightstand.  (Tr. 8, 19, 24, 57, 70, 74, 83.)  Additionally, after moving the dresser away from the wall, the Officers found a firearm inside of a sock,

---

[8] Because the undersigned recommends that Ms. Bowens voluntarily consented to the Officers' entry into the Room, the undersigned need not address whether the illegal objects in plain view were seen by one or more of the Officers before they entered the Room.  However, Detective Sowell testified that he saw a marijuana pipe and what could have been marijuana in plain view before entering the Room.  (Tr. 41.)  He also testified that, for officer safety, the Officers checked the Room for additional occupants when they entered.  (Tr. 47.)

and drugs, including crack cocaine, under the dresser.  (Tr. 20–21, 23–24, 29, 57, 74–75, 93.)

### B.    Summary of Testimony of Defendant's Witness

At the hearing, Ms. Bowens was Defendant's only witness.  She testified generally as follows.  On October 5, 2017, she was staying in the Room with Defendant, who is her fiancé.  (Tr. 101–02.)  When she was awoken by Defendant, she heard loud knocking on the door, and a sound indicating that the door was being tampered with, as if someone was about to come into the Room.  (Tr. 102–03.)  Defendant went to the bathroom, and Ms. Bowens put her clothes on and opened the door.  (Tr. 103–04.)  She knew the police were outside before opening the door because Defendant had told her.  (Tr. 113.)

When she opened the door, Ms. Bowens attempted to find out what the problem was, but the four police officers gave her no information.  (Tr. 104.)  They asked to speak with her and she felt pressured to open the door.  (Tr. 105.)  She responded that the officers could talk to her, meaning she would talk to them right there.  (Tr. 105.)  However, the officers started acting like they were going to come in the Room, as if she had invited them in.  (Tr. 105.)  They never asked if they could come in, and Ms. Bowens never said or gestured that they could come in, or invited them into the Room in any way.  (Tr. 105, 107, 114.)  Ms. Bowens did not believe the officers would leave if she shut the door, and she did not recall being told about the drug investigation.  (Tr. 105–06, 111.)

7

When the officers came in the Room, Ms. Bowens sat down on the bed to see what they wanted to talk to her about.  (Tr. 106.)  The officers spread out as if they were looking for someone.  (Tr. 106.)  Ms. Bowens was intimidated by the officers because they would not give her any information, and because she was awoken from her sleep and did not know what was going on.  (Tr. 107–08.)  Once inside the room, the officers never asked her if they could search the room, and she never voluntarily gave them permission to do so.  (Tr. 106–07, 114.)  She did not feel like she had a choice regarding the search, and she felt like they were forcing her to allow the search.  (Tr. 109.)

### C.    Credibility of the Witnesses

In short, the Officers were credible witnesses and Ms. Bowens was not.  The Officers' testimony was largely consistent, they were straightforward and open in their testimony, and their demeanor was believable.[9]  In contrast, Ms. Bowens was a poor witness.  She needed prompting from Defendant's attorney.  She was guarded in her testimony, and she was not able to tell an open, coherent story of what happened.

Moreover, Ms. Bowens, as Defendant's fiancé for the past two-and-a-half years, clearly has an interest in the outcome of this proceeding.  (Tr. 108.)  In fact,

---

[9] The undersigned acknowledges that the Officers could not remember every detail about the events that occurred on October 5, 2017.  However, this does not affect the undersigned's credibility determination.  The subject events occurred over eight months prior to the hearing, and the Officers readily admitted that they could not recall every detail. Nevertheless, their testimony regarding the significant facts was believable.

she specifically testified that she loves Defendant and would do anything to help him stay out of prison.  (Tr. 108–09.)  She also lives in Defendant's mother's house.  (Tr. 114.)

Additionally, Ms. Bowens's credibility was significantly impeached on cross-examination.  For example, she testified inconsistently about the basic fact of whether she had ever been arrested before.  On direct examination, Ms. Bowens testified that she had not been arrested prior to October 5, 2017.  (Tr. 99.)  However, on cross-examination, she admitted that she had been arrested for resisting officers without violence and for possession of cocaine.  (Tr. 109.)  Additionally, on direct examination, Ms. Bowens testified that she did not think the officers would leave if she shut the door, that she was not told that she could refuse consent or tell the officers to leave, and that she was intimidated by the police that day.  (Tr. 105–07.)  However, on cross-examination, she testified that, during the prior arrest, she ignored an officer, told the officer that she could not be arrested for words, closed and locked the door so that the officer could not get to her, and fled out of the residence.  (Tr. 110.)  Ms. Bowens also testified at the hearing that Defendant was not leaving clothes in the Room.  (Tr. 101–02.)  However, she previously testified during a grand jury proceeding that Defendant was leaving clothes in the Room.  (Tr. 111–12.)

In an attempt to bolster Ms. Bowens's credibility, Defendant offered into evidence a DVD depicting her interview with law enforcement after she was arrested

following the search of the Room (Defendant's Exhibit 4).   However, in the undersigned's view, the video does not bolster Ms. Bowens's credibility.  If anything, the video further detracts from her credibility because her testimony at the hearing differed significantly from her answers during the subject interview.  For example, at the hearing, Ms. Bowens testified that Defendant had been her fiancé for two-and-a-half years, and that he was her fiancé on October 5, 2017.  (Tr. 102, 108.)  However, during the interview, she told the officers that Defendant was family, like a cousin or a brother to her.  She never told them that he was her fiancé.  Additionally, at the hearing, Ms. Bowens testified that she did not know how long Defendant had been in the Room when he woke her up and told her the police were outside.  (Tr. 103.)  In the interview, Ms. Bowens stated that Defendant ran into the room from outside and woke her up.  Further, Ms. Bowens testified at the hearing that she did not see the manager of the Eagle Inn when she opened the door for the officers.  (Tr. 103.)  However, she stated during the interview that the manager knocked on the door first, and then the officers knocked.

In short, the undersigned generally accepts the Officers' version of the events occurring on October 5, 2017 as set forth above, and rejects Ms. Bowens's version.  Accordingly, the undersigned finds, and so recommends, that Ms. Bowens consented to the entry into and search of the room before each occurred.

### D.   Voluntariness of Consent

Having found that Ms. Bowens consented to the entry into and search of the

Room, the undersigned will now address whether that consent was voluntary. For the reasons set forth below, the undersigned recommends that, based on the totality of circumstances, the Government proved by a preponderance of the evidence that the consent was voluntary.

In considering the factors relevant to whether consent was voluntary, there is no credible evidence that the Officers used any coercive procedures to obtain consent to enter or search the Room. To the contrary, the Officers credibly testified generally as follows: the knock on the door of the Room was a regular knock; the Officers were not beating on the door (Tr. 68); the Officers did not draw their guns or raise their voices at any point (Tr. 33, 54, 82); and, although Ms. Bowens was not free to leave after illegal items were seen in plain view, she was not under arrest or in handcuffs when she consented to the entry into and search of the Room (Tr. 19, 29, 33, 43, 54, 72–73, 82–83, 92–94). In short, there were no coercive tactics, intimidation, threats, or abuse by law enforcement in obtaining Ms. Bowens's consent. *See United States v. Smith*, 199 F. App'x 759, 763 (11th Cir. 2006) ("[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.") (citation omitted); *United States v. Telcy*, 362 F. App'x 83, 85–87 (11th Cir. 2010) (affirming a district court's determination that consent to search was voluntary even though the defendant was "in handcuffs and in custody" where "the officers did not employ any coercive tactics," "did not brandish their weapons and did

11

not threaten [the defendant] or lie to him or otherwise unreasonably pressure him into acceding to their request").

Next, Ms. Bowens was generally cooperative with the Officers.  In addition to inviting them into the Room and consenting to the subject search, Ms. Bowens made small talk with them.  (Tr. 47, 73.)  Additionally, assuming that the Officers did not tell Ms. Bowens that she had a right to refuse consent, this does not invalidate an otherwise voluntary consent.[10]  *See United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004) ("To the extent Pineiro suggests that the police were required to . . . tell him he had a right to refuse consent, this Court has squarely rejected this argument.") (citing *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir.1999) (finding that the failure to inform the suspect that he had the right to refuse consent would not invalidate an otherwise valid consent) (citation omitted)).[11]  Moreover, it appears that Ms. Bowens knew that she could refuse consent.  During a prior arrest, she ignored an officer, told him that she could not be arrested for words, and closed and locked the door.  (Tr. 110.)

Regarding Ms. Bowens's education and intelligence, she testified that she

---

[10] Although Detective Sowell testified that it is customary to inform people of the right to refuse consent, he did not specifically recall telling Ms. Bowens that, and Officer Housend did not recall him saying that.  (Tr. 47, 73.)

[11] "Similarly, the lack of a consent to search form does not automatically render consent involuntary."  *See United States v. Edwards*, Case No. 1:10-CR-132-RWS/AJB, 2010 WL 5184784, at *5 (N.D. Ga. Oct. 13, 2010) (collecting cases).  Thus, the undersigned recommends that the failure to obtain written consent or use a form does not render Ms. Bowens's consent involuntary.

had completed eleventh grade.  (Tr. 99.)  Moreover, although Detective Sowell's arrest report indicated that Ms. Bowens stated she had recently smoked marijuana (Tr. 35) (which she denied at the hearing (Tr. 108)), the Officers testified that she did not appear to be under the influence of drugs or alcohol, that she appeared to understand the questions they asked, and that she answered those questions coherently and appropriately (Tr. 33, 54, 82).

Finally, it is unclear whether Ms. Bowens believed that additional incriminating evidence would be found during a search.  Thus, the undersigned recommends that this factor is neutral.  *See Tukes v. Dugger*, 911 F.2d 508, 517 n.14 (11th Cir. 1990) ("In this case, there is no evidence either way as to whether or not Tukes believed incriminating evidence would be discovered; accordingly, we do not put this factor on the scales.").

In short, considering all of the relevant facts and circumstances, the undersigned recommends that Ms. Bowens's consent was voluntary.

### E.    Defendant's Arguments

Defendant makes several arguments as to why the Officers' entry into and search of the Room was unconstitutional.  (Doc. 32, Tr. 119–26.)  For the reasons set forth below, the undersigned recommends that these arguments be rejected.[12]

---

[12] To the extent the undersigned does not explicitly address all of Defendant's arguments herein, the undersigned has still considered them and recommends that they be rejected.

### 1.   *Jones* Intrusion

First, Defendant argues that the Officers violated the Fourth Amendment because their entry into the Room constituted a trespass pursuant to *United States v. Jones*, 565 U.S. 400 (2012).  (Tr. 120.)  Specifically, Defendant contends that the Officers crossed the threshold into the Room either without consent, or before Ms. Bowens consented to their entry into the Room.  (Tr. 120.)  However, when Sergeant Pfannenstein was asked specifically about this on cross-examination, the following exchange took place:

> Q    Prior to being waved in, did any officer cross the threshold into that room?
>
> A    No, sir.
>
> Q    Are you sure about that?
>
> A    Absolutely.
>
> Q    And the only time officers crossed the threshold was after she waved all four officers to enter that room?
>
> A    Yes, sir.

(Tr. 18–19.)  The undersigned finds this testimony credible, and there is no credible evidence to the contrary.   Therefore, the undersigned recommends that this argument be rejected.

### 2.   Consent to Enter

Next, Defendant argues that Ms. Bowens did not consent to the Officers' entry

14

into the Room, as evidenced by the Officers' inconsistent testimony regarding the exact manifestation of the purported consent. (Tr. 122–23.) Specifically, Defendant argues that the Officers did not agree on the following points: whether Ms. Bowens gave verbal consent or only gestured for the Officers to enter the Room; and whether all Officers, or only Detective Sowell, was invited into the Room.   (Tr. 122.) Defendant also argues that even if Ms. Bowens stated that she would speak with the Officers, that does not constitute consent to enter the Room.  (Tr. 126.)

Sergeant Pfannenstein testified that Ms. Bowens waved the Officers into the Room and verbally asked them to enter the Room.  (Tr. 7, 17, 19.)  Detective Sowell testified that Ms. Bowens asked the Officers to come inside the Room because she wanted to talk inside, and that she quietly ushered them in.  (Tr. 28, 40–42.)  Officer Housend testified that Ms. Bowens motioned for the Officers to enter the Room, and that Officer Sowell and Sergeant Pfannenstein entered first, followed by Officer Johnson and Officer Housend seconds later.  (Tr. 53, 69–70, 72.)  Officer Johnson testified that Ms. Bowens asked them into the Room and said, "Come on in." (Tr. 81, 92.) The undersigned recommends that any inconsistency in the Officers' testimony was relatively minor and understandable.  Therefore, the undersigned recommends that this argument be rejected.

### 3.    Consent to Search and Scope of Search

Next, Defendant argues that the Government failed to prove that Ms. Bowens consented, without limitation, to a search of the Room.  (Tr. 123–25.)  In support of

15

this argument, Defendant contends that the Officers could not remember or testify consistently regarding the specifics of how the Officers got consent to search.  (Tr. 124.)  Additionally, Defendant argues that any such consent was limited to only "looking around" the Room, as opposed to opening drawers and moving furniture. (Tr. 124.)  The undersigned recommends that these arguments be rejected.[13]

As the Eleventh Circuit has stated:

> When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless.  Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.  In conducting the reasonableness inquiry, the court must consider what the parties knew at the time to be the object of the search.  Permission to search a specific area for narcotics, for example, may be construed as permission to search any compartment or container within the specified area where narcotics may be found.

*United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (citations and quotations omitted).

All four Officers testified that Ms. Bowens was informed that the Officers were conducting a drug investigation.  (Tr. 7, 29, 40, 47, 72, 82.)  Sergeant Pfannenstein testified that upon entering the Room, the Officers saw drugs in plain view and asked Ms. Bowens if there were any other illegal items in the Room.  (Tr. 8, 20, 23.)  Ms.

---

[13] Defendant also argues that any such consent was not voluntary because the Officers had already forced their way into the Room.  (Tr. 125.)  Because the undersigned has already found, and so recommended, that Ms. Bowens voluntarily consented to the entry into and search of the Room, the undersigned recommends that this argument be rejected.

Bowens said no, but that the Officers were free to search the Room.  (Tr. 8, 20.)

When Sergeant Pfannenstein was asked specifically about the scope of consent on

cross-examination, the following exchange took place:

> Q    What was the scope of consent that Ms. Bowens gave to you to
>       search that room?
>
> A    There was no [sic] none.
>
> Q    What do you mean by that?
>
> A    She didn't limit us to any specific area or part of the
>       room.
>
> Q    Did you believe it extended to moving the dresser?
>
> A    I believe that it extended to us searching the entire room, yes.

(Tr. 24.)

Detective Sowell testified on direct examination that upon entering the Room,

the Officers asked Ms. Bowens if they could have her permission to look around the

room and she said, "Yeah, no problem."  (Tr. 29.)  On cross-examination, Detective

Sowell testified that although he could not recall which Officer asked, one of the

Officers asked Ms. Bowens for her consent to search the Room, and she gave

verbal consent to search the Room.  (Tr. 43–44, 47–48.)  He also testified that Ms.

Bowens never objected to any part of the search by, for example, telling the Officers

not to search a particular part of the Room.  (Tr. 50.)

Officer Housend testified that once the Officers entered the Room, Detective

Sowell asked Ms. Bowens if the Officers could search the Room for drugs or

narcotics, and she said, "Yes, that's fine." (Tr. 54, 73.) Officer Johnson testified on direct examination that once inside the Room, the Officers asked Ms. Bowens if they could look around the Room and she said, "Sure. Go ahead." (Tr. 81–82.) On cross-examination, Officer Johnson testified that the Officers asked Ms. Bowens for consent to search the Room, and she said, "Go ahead. That's fine." (Tr. 92.) He also testified that Ms. Bowens essentially told the Officers that they could "take a look around." (Tr. 96.)

Although only Officer Housend testified as to who specifically asked for consent to search the Room, the testimony of all four Officers indicates that they asked Ms. Bowens for consent to search the Room and she gave verbal consent to do so. Moreover, the Officers' testimony establishes that Ms. Bowens knew that the Officers intended to search the Room for drugs.

Because "[p]ermission to search a specific area for narcotics . . . may be construed as permission to search any compartment or container within the specified area where narcotics may be found," the Officers could reasonably interpret Ms. Bowens's consent to encompass the opening of drawers and the moving of furniture. *See Martinez*, 949 F.2d at 1119. The fact that some Officers may have used the term "look around" as opposed to "search" does not alter the scope of the consent. *See, e.g.*, *United States v. Rios*, 443 F. App'x 433, 438 (11th Cir. 2011) ("Whether Rios stated that the officers could 'search' his room or that they could 'check' his room, a reasonable police officer would have believed that Rios was allowing him

18

to search for narcotics inside the drawers, luggage, and other containers" because "Rios knew that the officers were at his room because of suspicions regarding drug activity"). Thus, the undersigned recommends that, based on the collective testimony of all of the Officers, Ms. Bowens gave verbal consent, without limitation, to a search of the Room that included the moving of furniture and the opening of drawers.

### 4.    Reason for Knock and Talk

In support of his contention that the Officers entered and searched the Room without consent, Defendant argues that the Officers were not actually conducting a drug investigation based on a tip about the Room, but instead were trying to determine if Defendant was in the Room. (Tr. 125–26.) Defendant notes that the Officers testified as follows: they knew that Defendant and his brother frequented the Eagle Inn (Tr. 9, 45, 89); there was only a brief discussion prior to the knock and talk, and the Officers did not plan the specifics of it (Tr. 37–38, 66, 91); and that Defendant was taken directly to the Integrity Unit to be interviewed by the FBI when he was arrested (Tr. 60–64, 84–85, 96–97). (Tr. 125–26.) Based on that testimony, Defendant argues that the subject event was not merely a poorly planned knock and talk, but rather a conscious effort by the Officers to determine if Defendant was in the Room. (Tr. 125–26.) Thus, Defendant concludes that the Officers planned to, and did, enter the Room regardless of whether consent was given. (Tr. 125–26.) The undersigned recommends that this argument be rejected.

19

Sergeant Pfannenstein testified that on the morning of October 5, 2017, while on patrol in the area, he noticed a vehicle that appeared to be involved in a drug transaction in the parking lot of the Eagle Inn.  (Tr. 6.)  Sergeant Pfannenstein conducted a traffic stop of the vehicle and the occupants informed him that they were involved in a drug transaction.  (Tr. 6–7, 11–14.)  They told Sergeant Pfannenstein that an individual nicknamed "Red" at the Eagle Inn was also involved in the transaction.  (Tr. 6–7, 11–14.)  Sergeant Pfannenstein notified some of the other Officers and they made contact with "Red," who told them he had facilitated a drug transaction and informed the Officers to go to Room 115.  (Tr. 7, 11–14.)  All four Officers credibly testified that the purpose of the knock and talk was to conduct a drug investigation regarding the Room based on that tip.  (Tr. 7, 27–28, 53, 81.)  There is no credible evidence to support Defendant's speculative argument that the Officers conducted the knock and talk to determine if Defendant was in the Room, or that they were determined to enter the room regardless of whether consent was obtained.  Therefore, the undersigned recommends that this argument be rejected.

### V.    Conclusion

Based on the totality of circumstances set forth above, the undersigned recommends that the Government proved by a preponderance of the evidence that Ms. Bowens's consent to enter and search the Room was voluntary.  Thus, the undersigned recommends that the Officers' entry into and search of the Room was constitutional, and that the Motion be denied.

Accordingly, it is respectfully **RECOMMENDED** that:

The Motion (**Doc. 32**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on July 25, 2018.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Harvey E. Schlesinger
Senior United States District Judge

Counsel of Record

21